**TRANSCRIBED FROM DIGITAL RECORDING**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
SAINT FRANCIS HOSPITAL AND      )
MEDICAL CENTER, INC.,           )
                                )
                 Plaintiff,     )  Case No. 23 CV 15002
-vs-                            )
                                )  Chicago, Illinois
HARTFORD HEALTHCARE             )  December 6, 2023
CORPORATION, HARTFORD           )  1:31 p.m.
HOSPITAL, HARTFORD HEALTHCARE   )
MEDICAL GROUP, INC.,            )
INTEGRATED CARE PARTNERS, LLC,  )
                                )
                 Defendants.    )
--------------------------------)
Interested Party                )
                                )
Press Ganey Associates, LLC     )
```

TRANSCRIPT OF PROCEEDINGS - Motion Hearing
BEFORE THE HONORABLE YOUNG B. KIM, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:     HONIGMAN LLP
                       BY: MR. RON N. SKLAR
                       One South Wacker Drive
                       Suite 2800
                       Chicago, IL 60606


Transcriber:

            SANDRA M. TENNIS, CSR, RPR, RMR, FCRR
                    Official Court Reporter
                 United States District Court
            219 South Dearborn Street, Room 2260
                  Chicago, Illinois  60604
                  Telephone:  (312) 554-8244
                Sandra_Tennis@ilnd.uscourts.gov

```
 1  APPEARANCES:  (Continued)

 2  For Hartford
    Defendants:              SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
 3                           BY:  MR. LEO CASERIA
                             333 South Hope Street
 4                           Forty-third Floor
                             Los Angeles, CA 90071
 5

 6  For Press Ganey:         QUARLES & BRADY LLP
                             BY:  MR. MARK W. BINA
 7                           300 North LaSalle Street
                             Suite 4000
 8                           Chicago, IL 60654

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings heard in open court:)
2             THE CLERK:  23 CV 15002, Saint Francis Hospital and
3   Medical Center, Incorporated versus Hartford Healthcare
4   Corporation, *et al.*
5             THE COURT:  Good afternoon, Judge Kim here.  Is
6   anyone on the line for Saint Francis Hospital?
7             MR. SKLAR:  Good afternoon, Judge Kim.  Yes, this is
8   Ron Sklar on behalf of Saint Francis.
9             THE COURT:  Thank you.  How about for Hartford?
10            MR. CASERIA:  Good afternoon, your Honor.  This is
11  Leo Caseria from Sheppard Mullin on behalf of the Hartford
12  Healthcare entities.
13            THE COURT:  Anyone else for Hartford?  Okay.  And
14  for -- and for Press Ganey.
15            MR. BINA:  Yes.  Hi.  Good afternoon, your Honor.
16  Mark Bina, that's B-i-n-a, on behalf of Press Ganey.
17            THE COURT:  All right.  Thank you.  So first let's
18  deal with the issue of jurisdiction.  Mr. Bina, do you have
19  any opposition to this particular district handling this
20  issue?
21            MR. BINA:  We do not, your Honor.  We -- we agree
22  that Northern District of Illinois is a valid district here.
23  Understanding we can't consent to jurisdiction.  I understand
24  you either have it or you don't.  But our view of the rule I
25  think is consistent.  One thing we can agree on with the

1  Movants here is that the applicable rule, I think it's
2  45(c)(2)(A), we obviously have an office in Chicago, we have
3  an office in South Bend, so we think this is appropriate.
4  　　　　　THE COURT: Okay. Thank you. Then let me ask if
5  Mr. Caseria and Mr. Bina, have you had any discussions since
6  the -- since the Court changed the status hearing to today?
7  Let's start with --
8  　　　　　MR. BINA: No, your Honor.
9  　　　　　THE COURT: -- Mr. Caseria. Okay.
10  　　　　　MR. BINA: I'm sorry, go ahead.
11  　　　　　THE COURT: That was Mr. Bina?
12  　　　　　MR. BINA: Yes. Sorry, Judge. I was starting too
13  soon.
14  　　　　　THE COURT: Okay. That's fine. I do want to
15  comment, or I should say, ask a question based on Press
16  Ganey's argument. Mr. Caseria, I understand that you asked
17  for the same documents from Saint Francis, but you did not get
18  everything from Saint Francis. And it looks like from the
19  motion what you did get was a copy of the 2018 survey. Is
20  that correct?
21  　　　　　MR. CASERIA: Your Honor, that's correct. We served
22  a comprehensive set of document requests that would have
23  captured all of the same documents that we are requesting from
24  Press Ganey, to the extent they were in Saint Francis'
25  possession. What we have pointed us to the existence of 2016

1  and 2018 position engagement survey results. And we are
2  requesting from Press Ganey whatever they might have in
3  connection with the three RFPs that were served. And I'll
4  just add that, given the nature of how these surveys are
5  conducted, as far as we understand, it would be difficult for
6  us to know what would be in Saint Francis' possession and
7  where that ends and where things might only be in Press
8  Ganey's possession. Because as we understand it, these
9  surveys are conducted to provide confidentiality to the
10 respondents, protect their identities from the employer,
11 et cetera. And so it's difficult for us to know where one
12 party's materials ends and the others begin.
13          And also on top of that, the two surveys that we're
14 aware of from 2016 and '18 are several years ago, and so
15 retention practices may be different for Saint Francis and
16 Press Ganey.
17          THE COURT: So just so we're clear, you do have a
18 copy of the 2018 survey results. Right?
19          MR. CASERIA: That's right. That's right, your
20 Honor.
21          THE COURT: Let me ask you, Mr. Sklar, is that the
22 only document you have pertaining to surveys conducted by
23 Press Ganey, the 2018 survey results?
24          MR. SKLAR: Your Honor, to -- to be very frank, it's
25 not a portion of the case that I am handling, so I just -- I

1 couldn't represent either way. I don't know the formal answer
2 to that. We're obviously more than happy to, I'm certain, to
3 meet-and-confer with defense counsel in that matter. And to
4 the extent that we have something that should be produced, of
5 course we would produce it. But I just don't know the answer
6 to your response -- to your question sitting here today.
7       THE COURT: All right. I appreciate the frankness of
8 your answer.
9       MR. SKLAR: Yeah.
10       THE COURT: It's always better to say you don't know
11 if that's the case.
12       Mr. Caseria, was there any motion practice before the
13 District Court in Connecticut in terms of compelling Saint
14 Francis to produce additional documents? Because it's not
15 only possession of responsive documents, it's also what
16 documents control -- I mean, what documents Saint Francis has
17 control over. It's possible that Saint Francis does not have
18 control over certain documents, but certainly the 2016 survey
19 results, Saint Francis should be entitled to. And they may
20 not be entitled to the underlying documents, for example, the
21 questionnaires and confidential submissions.
22       So was there any motion practice regarding the three
23 categories of documents that are included in the subpoena?
24       MR. CASERIA: No, there was not, your Honor. And
25 there has been extensive meet-and-confers since 2022 on -- on

1  all 147 RFPs to Saint Francis. And we have just under 6000
2  documents from Saint Francis that refer or relate to Press
3  Ganey in some way, but there has not been motion practice.
4  And the focus of our subpoena to Press Ganey are documents
5  that we don't think would be in Saint Francis' possession.
6  For example, the individual survey responses which would have
7  been only aggregated and anonymized when provided back to
8  Saint Francis. And then also the methods and processes
9  internally at Press Ganey for how they conduct the surveys
10 that they did for Saint Francis.
11         And, again, I would direct your Honor to the *Viacom*
12 case that we -- that we cited in our reply brief. You know,
13 because this is a body of material that I don't think is easy
14 to determine where -- where one party's documents begin and
15 the others end, our reading of the case law is that we can
16 proceed against both to try and obtain the documents that we
17 need to get as -- as there will clearly be differences in
18 retention, given the age of the materials. And, again, the
19 focus of what we're looking for here is going to be material
20 that is -- that is uniquely in Press Ganey's possession.
21         THE COURT: Well, let's set that aside for a second.
22 Do you have a discovery deadline in the Connecticut case?
23         MR. CASERIA: We have depositions scheduled to start
24 in February. And fact discovery does not end until the second
25 half of next year. But I think the key deadline, from our

1  perspective, is depositions starting in February.  In order
2  for us to proceed with and make intelligent decisions about
3  who to depose in our deposition period which runs from
4  February through, I believe, July -- or June, rather.
5  February to June is our period for taking fact depositions.
6  And in order to make informed decisions, we're going to, in
7  particular, need to know who the individuals are that
8  correspond with certain survey comments and results,
9  et cetera.
10              Our understanding from the link that was cited in our
11  reply, I believe it's Footnote 6, is that when survey
12  responses -- when fewer than five people respond to a
13  particular question or category or subject matter, Press Ganey
14  does not provide aggregated results back to their -- their
15  client on that.  So there may be a number of comments that we
16  don't even have.  So that's -- for our purposes I think the
17  deposition deadline is -- is looming and is -- is what we're
18  focused on.  But the end of fact discovery as a whole is not
19  until December of next year.
20              THE COURT:  Let me ask this question:  Certainly
21  looking, or I should say, reviewing the underlying documents
22  in order to perform the survey, it is important to make sure
23  that the survey result is, in fact, supported.  But why is it
24  necessary for the defendants to understand the actual mental
25  process that Press Ganey went through to prepare the reports?

1    And I ask that question because this isn't a situation where
2    you have competing experts like in a trademark case where
3    surveys are very important. This is a situation where the
4    defenses, you know, Saint Francis itself retained a
5    third-party vendor to study its environment. And those
6    reports show deficiencies within their working environment.
7         Why do we have to go beyond that and actually test
8    Press Ganey's analysis?
9         MR. CASERIA: Your Honor, there could be a number of
10    reasons why that information may be relevant and important.
11    For example, you know, one, there may be decisions that are
12    being made about subjects and topics to include in a survey or
13    to include in a report. There may be certain amount of
14    editing that goes into the report that Press Ganey provides
15    back to Saint Francis beyond, you know, picking and choosing
16    raw responses from the underlying physicians who are
17    participating. There may be a number of other things that are
18    happening that we just don't know about. You know, we have a
19    final survey response that is aggregated and anonymized and
20    provided back to Saint Francis. Without knowing all the steps
21    that go into putting that together, it's hard for us as the
22    defendants to make full uses of what we have. Certainly
23    having the underlying -- the underlying physician responses is
24    -- it's helpful. But to the extent there are differences
25    between what the physicians are providing to Press Ganey, what

1  Press Ganey provides to Saint Francis, I think that's
2  important for us to understand as well.
3       THE COURT:  Okay.  I just wanted to do an attendance
4  check because that sounded like somebody dropped off.
5       Mr. Sklar?
6       MR. SKLAR:  I'm still here.
7       THE COURT:  Mr. Bina?
8       MR. BINA:  I'm here.
9       THE COURT:  Huh.  Karen, are you -- Oh, wait, there
10 was one caller who did not identify him or herself.  Maybe
11 that was the person.
12      All right.  So going back, then, let me make sure I
13 asked all the questions.  Mr. Bina, I have a question for you.
14      MR. BINA:  Yes.
15      THE COURT:  Do you know whether Press Ganey has
16 actually looked into whether they even have these documents
17 connected -- I'm sorry, documents related to the 2016 survey,
18 the underlying documents for the 2018 survey, and certain --
19 and any agreements entered into between Saint Francis and
20 Press Ganey?
21      MR. BINA:  As I sit here, I don't, your Honor, I
22 think in part because of, you know, the objections that were
23 asserted by letter.  They were I think of the mind that that's
24 something that you ought to get from the party first.  I think
25 as the Court pointed out earlier, that's an option.  So I

1  think they were of the mind, again, we'd rather not have to,
2  you know, you know, incur any further expense until the party
3  discovery is completed. I mean, it's one thing for them to
4  come back and say, hey, we've exhausted all resources, now we
5  need to come to you. But as I sit here, I just don't know
6  without checking with the client.
7  THE COURT: Let me ask you, Mr. Sklar, do you know
8  whether Saint Francis has taken a position that the 2018
9  survey is not worth anything because the analysis is somehow
10 flawed?
11 MR. SKLAR: Not that I'm aware of.
12 THE COURT: Okay. So here's what I will say
13 regarding the pending motion to compel. I'm not going to
14 issue a ruling just yet. I do think that the parties need to
15 talk. Parties -- what I mean by parties, Saint Francis, Press
16 Ganey, and Hartford. It has been my practice, and it's the
17 prevalent practice in the Northern District of Illinois, you
18 don't serve subpoenas on third parties unless all efforts have
19 been exhausted with the underlying parties in the case.
20 What I'm hearing from you, Mr. Caseria, you may have
21 some general understanding that Saint Francis may not have
22 some of these documents. That simply isn't good enough.
23 That's why I asked about the motion practice. And so, now,
24 unless Saint Francis told you we do not have these documents
25 and we don't have any control over those documents because

1  Press Ganey will not give them to us, unless you get to that
2  point, serving a subpoena on Press Ganey is premature.
3         That said, as you said, certain documents would not
4  be in Saint Francis Hospital's possession.  And these
5  documents are the underlying documents, survey responses,
6  answers to questionnaires, and whatever else that Saint
7  Francis Hospital staff members may have submitted.  Quite
8  frankly, those raw data, that raw data, is more important than
9  the report itself because we're talking about unfiltered
10 statements and comments made by Saint Francis members.
11        So it is true that it probably is the case and Saint
12 Francis probably does not have any documents showing the
13 procedures that Press Ganey may have complied with in
14 performing the survey.  I say "may not" because if I am Saint
15 Francis Hospital, I want to know, how did you conduct the
16 survey to better understand the reliability of the survey
17 report?  So it's possible Saint Francis Hospital does have
18 these types of documents.  Whereas, Press Ganey is explaining
19 the procedure that was taken in order to issue the survey
20 report.
21        Now, the third category of documents, certainly Saint
22 Francis Hospital should have them because these are documents
23 exchanged between Saint Francis and Press Ganey.
24        The point I'm making here is that the three of you
25 have to discuss who has what and what makes most sense.  And I

1 say the last part, what makes most sense, if it's a situation
2 where Saint Francis Hospital simply has to tell Press Ganey to
3 please give us these documents so we can then give to
4 Hartford, then cut out the middleman. Why bother with that.
5 You know, just go ahead and provide the documents for
6 Hartford.
7     Now, what documents are we talking about? I will
8 give you some guidance. 2016 survey report should be
9 produced. The underlying documents that Press Ganey collected
10 in order to actually conduct the survey, those documents
11 should be produced. The documents showing processes or
12 procedures that Press Ganey followed, those documents should
13 be produced. Now, Press Ganey talks about proprietary
14 information. It's not clear to me exactly what that is. I'm
15 not sure whether there is some algorithm that Press Ganey uses
16 or some software that Press Ganey uses. But if that is the
17 case, then I don't see why that particular information is
18 relevant here because what's important is what the employee
19 said, and the survey itself may simply be a comprehensive
20 summary of what the survey shows. And unless -- unless Saint
21 Francis Hospital is taking a position that the 2016 survey,
22 2018 survey are worthless because they are not reliable, then
23 we may get into the issue of whether the analysis and all the
24 work that went into are, in fact, relevant to this case. But
25 until then, I don't see the need for Press Ganey to provide

1  any more than what I've just listed.
2       Now, again, these are just -- this is just the, you
3  know, my guideline to the parties to help you having more
4  meaningful meet-and-confer among the three parties.
5       I don't have anything else to say today.  The motion
6  is going to be taken under advisement.  I would like to have
7  another hearing by phone.  Let's see, with the holidays coming
8  up, I'm going to ask you for some help in deciding how quickly
9  we can have the next status hearing -- I'm sorry, motion
10 hearing.  That depends on what kind of timeframe the parties
11 need to meet-and-confer.
12      So here's what I'm going to do.  I'm going to go
13 ahead and ask Mr. Caseria to e-mail my courtroom deputy by
14 December 12th with a date of the parties' meet-and-confer.
15 That will give me some guidance as to when I should have the
16 next motion hearing.  So any questions, Mr. Caseria?
17      MR. CASERIA:  Thank you, your Honor.  So just to make
18 sure I understand, you're -- you're saying that the survey --
19 the 2016 survey should be produced, the underlying materials,
20 responses, submitted by physicians should be produced.
21 Procedures that were followed for these particular surveys
22 should be produced, but you want the three -- the three
23 parties involved here today to meet-and-confer and talk about
24 how that's going to happen and who is doing what.  Is that --
25      THE COURT:  Correct.

1    MR. CASERIA:  Do I have that correct?  Okay.
2    THE COURT:  Yes.  But it also applies to the 2018
3 survey.
4    MR. CASERIA:  Right.
5    THE COURT:  The same categories of documents.
6    MR. CASERIA:  Thank you.  Okay.
7    THE COURT:  Any other questions, Mr. Caseria?
8    MR. CASERIA:  No, that's -- that's -- I think that's
9 clear.  And we will e-mail your clerk by December 12th with
10 the date of the meet-and-confer.
11   THE COURT:  Mr. Bina, any questions from you?
12   MR. BINA:  No questions, your Honor.  Thank you.
13   THE COURT:  Mr. Sklar?
14   MR. SKLAR:  Also no questions.  Thank you, your
15 Honor.
16   THE COURT:  Okay. All right.  So once I get the date
17 of the meet-and-confer, I will issue another order setting
18 down a motion hearing.  Thank you for your time today.
19 Bye-bye.
20   MR. BINA:  Thank you.
21   MR. CASERIA:  Thank you.
22   MR. SKLAR:  Thank you.
23   (Which were all the proceedings heard.)
24
25

| | |
|---|---|
| 1 | CERTIFICATE |
| 2 | I certify that the foregoing is a correct transcript from |
| 3 | the digital recording of proceedings in the above-entitled |
| 4 | matter to the best of my ability, given the limitations of |
| 5 | using a digital-recording system. |
| 6 | |
| 7 | */s/Sandra M. Tennis*        January 1, 2024 |
| 8 | _____    _____ |
|   | Sandra M. Tennis                    Date |
| 9 | Official Court Reporter |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |