1        **TRANSCRIBED FROM DIGITAL RECORDING**

2            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
3                      EASTERN DIVISION

4    SAINT FRANCIS HOSPITAL AND          )
     MEDICAL CENTER, INC.,               )
5                                        )
                        Plaintiff,       )   Case No. 23 CV 15002
6    -vs-                                )
                                         )   Chicago, Illinois
7    HARTFORD HEALTHCARE                 )   December 22, 2023
     CORPORATION, HARTFORD               )   9:34 a.m.
8    HOSPITAL, HARTFORD HEALTHCARE       )
     MEDICAL GROUP, INC.,                )
9    INTEGRATED CARE PARTNERS, LLC,      )
                                         )
10                      Defendants.      )
     ------------------------------      )
11   *Interested Party*                  )
                                         )
12   Press Ganey Associates, LLC         )

13          TRANSCRIPT OF PROCEEDINGS - Motion Hearing
          BEFORE THE HONORABLE YOUNG B. KIM, MAGISTRATE JUDGE
14

     APPEARANCES:
15

     For the Plaintiff:    HONIGMAN LLP
16                         BY:  MR. DAVID ETTINGER
                           One South Wacker Drive
17                         Suite 2800
                           Chicago, IL 60606
18

19

20   Transcriber:

21                 SANDRA M. TENNIS, CSR, RPR, RMR, FCRR
                        Official Court Reporter
22                   United States District Court
                   219 South Dearborn Street, Room 2260
23                     Chicago, Illinois  60604
                     Telephone:  (312) 554-8244
24                 Sandra_Tennis@ilnd.uscourts.gov

25

```
 1   APPEARANCES:   (Continued)

 2   For Hartford
     Defendants:              SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
 3                            BY:   MR. LEO CASERIA
                              333 South Hope Street
 4                            Forty-third Floor
                              Los Angeles, CA 90071
 5

 6   For Press Ganey:         QUARLES & BRADY LLP
                              BY:   MR. MARK W. BINA
 7                            300 North LaSalle Street
                              Suite 4000
 8                            Chicago, IL 60654

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings heard in open court:)

2         THE CLERK:  Case 23 CV 15002, Saint Francis Hospital

3    and Medical Center, Inc., versus Hartford Healthcare

4    Corporation, *et al*, here on motion hearing.

5         THE COURT:  Good morning, Judge Kim here.  Who is on

6    the line for Saint Francis?

7         MR. ETTINGER:  David Ettinger, your Honor.

8         THE COURT:  For Hartford?

9         MR. CASERIA:  Leo Caseria from Sheppard, Mullin, your

10   Honor.

11        THE COURT:  And for the subpoena respondent, Press

12   Ganey?

13        MR. BINA:  Good morning, your Honor.  Mark Bina,

14   that's B, as in bravo, i-n-a.

15        THE COURT:  Thank you.  So let's go ahead and start

16   with an update on the parties' trilateral meet-and-confer.

17   Who would like to give me an update?  Maybe I'll go with

18   Mr. Caseria.

19        MR. CASERIA:  Thank you, your Honor.  So -- so as

20   your Honor instructed at the last hearing, we

21   met-and-conferred, and as you said, had a trilateral

22   meet-and-confer.  That was last Friday and again yesterday.

23   And we talked through the three categories of documents that

24   were discussed at the last hearing that your Honor identified

25   for our meet-and-confer discussions.  And I can give you an

1    update on those three categories in order, starting with the

2    raw non-anonymized physician engagement survey responses.  We

3    talked about that category and Press Ganey confirmed that it

4    has the 2016 and 2018 raw responses in its possession.  Saint

5    Francis represented that it stopped using Press Ganey for that

6    type of survey after 2018.  So it looks like those two years

7    are the years at issue.

8         Now, there are two issues that came up that I think

9    may require additional guidance from your Honor, and I'll just

10   tee those up and pause.

11        The first issue is that Press Ganey raised

12   confidentiality concerns, and they are objecting to the

13   production of this category of material on confidentiality

14   grounds, citing to their pledge of confidentiality as it made

15   to the survey participants.  Saint Francis -- Saint Francis's

16   counsel indicated their client made a similar pledge and had

17   the same objection.  Our position for Hartford is that the

18   protective order that's in place in the case provides adequate

19   protection for this type of issue.  And so that's one issue

20   that I think will require further guidance.

21        The second issue is -- relates to how the information

22   is maintained by Press Ganey.  As we learned from Press Ganey,

23   the responses from Saint Francis physicians are maintained in

24   groups together with responses from other physicians at other

25   hospitals that are owned by the same parent entity, which is

1     Trinity. And so Press Ganey has around 400 physician survey

2     responses, including Saint Francis and other sister hospitals

3     all grouped together. I think my suggestion on the path

4     forward there, assuming we get past the confidentiality

5     issues, would be for Press Ganey to provide a list of the

6     doctor names, and then we can identify the ones -- the subset

7     that relate to Saint Francis. And so that seems like a

8     workable path forward, in my view.

9         But let me pause there because that's the first

10    category of documents that we talked about, and those are the

11    two issues that are -- still need some additional guidance.

12    So let me pause there and see if your Honor has any questions.

13         THE COURT: Yes. So question number one, Saint

14    Francis has a copy of the 2016 survey? Mr. Ettinger?

15         MR. ETTINGER: Your Honor, we do not have a copy of

16    de-anonymized information. We were only provided information

17    on an anonymous basis. And I should add, it's a little

18    unclear to me what we have even in terms of anonymous

19    information. We have some that was produced already to

20    Hartford Healthcare. But given the time of year and people

21    being off, I have not been able to ascertain precisely what

22    else, if anything, Saint Francis has.

23         THE COURT: The reason why I ask that question is

24    because when I went through the briefs, it looked like Saint

25    Francis turned over the 2018 survey and not the 2016 survey.

1    And that's why I'm asking whether you have a copy of the 2016

2    survey, whatever form it's in.

3            MR. ETTINGER:  Right, your Honor.  And as I say, I'm

4    trying to figure out what we have.  I just haven't --

5            THE COURT:  Okay.

6            MR. ETTINGER:  -- got to the bottom of that just

7    because of people being out at the time of year.

8            The other thing -- I don't know if your Honor wants

9    to hear about this now, but we do have a couple of comments on

10   the confidentiality issue.

11           THE COURT:  Okay.  Go ahead.

12           MR. ETTINGER:  Your Honor, I'd really characterize it

13   as a privacy issue.  The -- you know, Saint Francis and Press

14   Ganey said to these doctors, please provide these answers,

15   this information will be anonymous.  The protective order

16   would, if the appropriate designation is made, restrict the

17   information to outside counsel and I think one inside counsel

18   for each party and outside experts.  And, of course, you know,

19   if any of this were used at trial or in a filing, then the

20   Court would decide whether it would become public.  Nobody

21   said that these doctors, this will be anonymous except a

22   lawyer may see it and question you in a deposition about it

23   later.  And so we do have concerns that, you know, disclosing

24   this information in a non-anonymous way will -- will aggregate

25   the assurances we made to our doctors about the conditions

1    under which they would provide that information.  And they

2    might not be very happy about that.  And we think they had a

3    reasonable expectation of privacy in terms of their responses

4    and that ought to be preserved completely, not -- not -- you

5    know, not a situation where even if the business people can't

6    see it, lawyers can see it and ask them about it.  That

7    violates that expectation of privacy.

8            THE COURT:  Do you have any comments regarding the

9    second point that Mr. Caseria brought up, the fact that the

10   data is essentially maintained together with survey responses

11   from Trinity physicians?

12           MR. ETTINGER:  Your Honor, I think that's correct.

13   It's actually Trinity Health of New England, I think is

14   separate, which is several hospitals, including Saint Francis.

15   But I think assuming your Honor otherwise wanted to order the

16   information produced, Mr. Caseria's suggestion as how to do it

17   seems workable.

18           THE COURT:  Okay.  Mr. Bina, how about you?  Any

19   comments?

20           MR. BINA:  Thank you, your Honor.  I do have some

21   brief comments.  And first off, I'll just somewhat out of

22   order emphasis and support Mr. Ettinger's comment that, you

23   know, Press Ganey's business was founded, right, on this

24   notion of anonymity.  And of course we're a big operator in

25   this state and are very active.  And my client really wanted

1   to emphasize to you that this is somewhat an unusual situation

2   where we appreciate and understand the existence of a

3   protective order, but in the marketplace our client has grave

4   concern that there will be a chilling effect on its business,

5   right, if it is -- it has to disclose or, frankly, out the

6   identities of physicians or providers that have otherwise been

7   assured, and we gave them a pledge, like a very clear, you

8   know, cemented pledge, you know, our word is our bond, right,

9   that this will never, ever, ever come out.

10          And there's a notion that, well, you don't

11  understand, a protective order, we'll all abide by it, and I'm

12  sure counsel here on the phone and others.  But that doc may

13  not, right?  The doc who ultimately is going to be deposed may

14  ultimately complain or speak to others, and then suddenly the

15  word on the street is, well, guess what, now Press Ganey is

16  sharing this information, and it would have significant

17  negative effects on our business.  I just wanted to really put

18  a point on that.  My client obviously feels very strongly and

19  asked me to convey to you, given -- given the nature of our

20  unique business.

21          So I just wanted to frame that, that we absolutely

22  support this notion of privacy is not as simple as just the

23  protective order.  This really does have a real-world effect

24  on our business going forward if we're ordered to provide

25  de-anonymized data.

1          And I will secondarily note that, yes, Mr. Caseria is

2    right, the way this data is held.  I wish I could tell you,

3    Judge, there is an easy button we could press and say, look,

4    here's the 2016 data for Saint Francis.  But unfortunately

5    through the passage of time I'm told our client has used

6    different platforms or different tools, right, to analyze and

7    view the data.  And it just so happens that the tool that was

8    used back when this survey went on, they're no longer a

9    provider, Press Ganey no longer works with them.  They, of

10   course, have the underlying raw data, but it is just that,

11   raw, aggregated data across, I'm going to estimate, you know,

12   15 or 20 different hospitals.  And it is just going to be an

13   eye chart, I'm told, of data if one were to look at it, which,

14   again, is raw.  It's identities, you know, names.  It's raw

15   answers to surveys.  It's inputs, and all that.  Which is, of

16   course, the most highly secretive information that we have

17   here.

18          So I just wanted to share that, of course, in terms

19   of background, that, we, of course, will work with diligence

20   to figure out what we have and don't have, but it's --

21   unfortunately there's a wrinkle in terms of how it's

22   maintained currently.

23          THE COURT:  Mr. Caseria mentioned that the 2016-2018

24   raw responses total about 400 survey responses; is that

25   correct?

1          MR. BINA:  I believe that's right, your Honor.  I

2     don't have the exact figure in front of me.  Of course, I

3     don't have the raw data in front of me.  But we had two

4     over-hour-long meet-and-confers.  I had both two

5     representatives from Press Ganey join me in those calls so

6     Mr. Caseria heard it directly from the source.  I have no

7     reason to disbelieve that.  But that -- that does sound right.

8          THE COURT:  All right.  With respect to the

9     confidentiality issue, I recognize the importance of

10    confidentiality.  I also recognize Press Ganey's promise to

11    the physicians that their information is going to remain

12    confidential.  But Rule 26 is quite clear asking what is

13    exculpable.  And unless there is privilege that bars or, I

14    should say, protects Press Ganey from producing this

15    information, it is, in fact, to be produced.

16          There is one way to protect the confidentiality, and

17    that is to mark the raw data, meaning the survey responses, as

18    attorneys' eyes only.  And this will protect Press Ganey, and

19    Saint Francis will never know.  Not -- Saint Francis attorneys

20    will know, but not Saint Francis management, the names of the

21    physicians and their responses.  And if it turns out that

22    these responses are, in fact, helpful to Hartford's theory of

23    defense, there can be a stipulation that Dr. A is, indeed, a

24    doctor or was a doctor during the relevant time period so that

25    the names are not disclosed in any way whatsoever in the

1    public forum.

2         With respect to the data maintained not in any

3    separate way, there are two ways of going about it.  One,

4    Press Ganey can go ahead and produce all raw responses and let

5    Hartford deal with -- deal with identifying the specific

6    physicians who should be specified for their own use.  Or the

7    second way is that Press Ganey goes through the names the

8    doctors for the 2016 and 2018 surveys for Saint Francis and

9    produce only those survey responses for Hartford.

10        There's this issue of a third-party vendor having to

11   incur costs, then that's something else that Hartford needs to

12   address.

13        So let me stop there and ask any comments.  And I'll

14   start with Mr. Ettinger and I'll turn to Mr. Bina.

15        MR. ETTINGER:  Your Honor, your comment about how

16   this could be resolved in terms of identifying that the doctor

17   was, in fact, a Saint Francis doctor, if I understood you

18   correctly, I don't quite understand how that would work.  As I

19   understand Hartford's argument here, if they were to obtain a

20   comment from a doctor whose practice was acquired by Hartford

21   and is at issue in this case and that comment was negative

22   about Saint Francis in some way, they would want to presumably

23   use that to file a summary judgment motion, a filing that

24   might become public and say, you know, Dr. Jones said

25   such-and-such.  And so there -- you know, the way they would

1   want to use the information would disclose exactly what the

2   doctor said, which is, you know, which completely contravenes

3   any expectation of privacy.  So I don't know that there is a

4   way to allow this information to be provided without creating

5   the risk that it is ultimately disclosed not just to lawyers

6   but in a public proceeding.

7        THE COURT:  Well, if that's the case, that's the

8   case.  It is what it is.  Relevant information is to be

9   produced.  And no one has argued today that this particular

10  survey response is privileged in some way that there is a

11  legal doctrine that bars Hartford from securing this

12  information.

13       And in terms of anonymizing, we can only do what we

14  can, which is -- let's take your example for a second,

15  Mr. Ettinger, for discussion purposes.  When Hartford files

16  the answer, or I should say the motion, Hartford can certainly

17  describe that he or she is a physician who was employed with

18  Saint Francis or an entity that was purchased or taken over by

19  Saint Francis.  So we're using general descriptions to

20  describe the physicians who submitted survey responses.  And

21  if I heard you correctly, Mr. Ettinger, perhaps even with that

22  the response itself may be -- may, in fact, reveal the

23  identity of the physician.

24       Well, you know, there is another step that the

25  parties can take, which is to file something under seal so

1   that it's not in the public forum.  So we can do what we can,

2   but we're not going to find a perfect solution.  Oftentimes in

3   cases privacy interests are sometimes taking a back seat

4   because the information is relevant.  So privacy interest

5   alone is not going to prohibit Hartford from securing relevant

6   information.

7            Mr. Bina, your comments?

8            MR. BINA:  Your Honor, no, thank you.  I appreciate

9   that and understand it.  I would just, again, kind of

10  emphasize here that we're still somewhat unclear what Saint

11  Francis has.  I should correct -- I should say at the last

12  hearing I remember, you know, part of this was we wanted the

13  parties to conclude any information they had and didn't have,

14  and I understand that process is ongoing.  I guess our view

15  would be we would be reluctant to have to turn anything over

16  unless we know or have certainty that the parties have

17  exhausted those efforts.  And I guess I'm not 100 percent

18  clear.  I heard from Mr. Ettinger earlier that perhaps there

19  was still reviews going on, so I would flag that.  But

20  otherwise, no, that would be -- that would be our position.

21            THE COURT:  No, I absolutely agree with you.  You

22  know, you shouldn't have to turn over things that the

23  underlying parties can turn over.  But at the end of the day,

24  when you look at the nature of the information in Category 1,

25  there is no way that Saint Francis has the raw survey

1    responses because, like you said, Press Ganey would not have

2    turned that over to Saint Francis, which means Press Ganey

3    must produce the raw responses to Hartford.

4           MR. BINA:  Understood, your Honor.  I guess the

5    other --

6           THE COURT:  Mr. --

7           MR. BINA:  I'm sorry, your Honor.

8           THE COURT:  Yes, go ahead.  No, no, go ahead.

9           MR. BINA:  I apologize.  All I was going to say is,

10   you know, I know your Honor had suggested a couple ways that

11   could go in terms of Press Ganey, you know, conveying the data

12   perhaps to Hartford, they could identify it or

13   (unintelligible) to identify it.  Perhaps one other idea just

14   in terms of being creative here.

15          THE COURT:  Yes.

16          MR. BINA:  Could one angle be to provide the data to

17   Saint Francis?  Because I guess our client's view would be we

18   want to find the least intrusive means, right?  This is Saint

19   Francis's data ultimately.  So the idea that they own the

20   data, we are their vendor, perhaps one angle is we could

21   provide the data in confidence to Saint Francis and then allow

22   Saint Francis -- you know, allow the parties in their main

23   case in Connecticut tango over that, right, whether it's

24   discoverable or not.

25          We just want to make sure that, again, the data is

1   protected as much as it can be and in terms of where we

2   provided it to.  I understand that's an unusual request, the

3   subpoena came from Hartford, but we're just trying to think

4   through who owns the data.  And given the significance of it,

5   that might be an alternative to consider.

6           THE COURT:  Uh-huh.  I appreciate that.  Mr. Caseria?

7           MR. CASERIA:  Thank you, your Honor.  I think

8   Mr. Bina's suggestion would be fine with us.  We would only

9   ask that if we're going that route that we have specific

10  deadlines for Saint Francis to do what it needs to do.  And

11  while I have no doubt Mr. Ettinger will work with his client

12  as quickly as possible, we -- you know, we are mindful of the

13  upcoming depositions start date.  So that would be my only

14  submission to what Mr. Bina suggested.

15          THE COURT:  Thank you.  So just so we're clear,

16  Mr. Bina, what you're suggesting is that rather than Press

17  Ganey going through the raw responses, you'd rather go ahead

18  and provide the entirety of the dataset to Mr. Ettinger's

19  office under attorneys'-eyes-only designation, let

20  Mr. Ettinger's team go through and figure out which responses

21  are relevant to this particular action, based on the names of

22  physicians.  Do I have that right, Mr. Bina?

23          MR. BINA:  I think that's right.  I was just trying

24  to think of an alternative to -- yeah, that was kind of the

25  idea, is to look -- again, ultimately it's their data, right,

1    from our position.

2          THE COURT:  Sure.

3          MR. BINA:  I think out of all these options, that's

4    probably the one that -- I'll just leave it at that, yeah.

5          MR. ETTINGER:  Your Honor, David Ettinger again.  If

6    I could just jump in.  What I understood Mr. Bina to also say,

7    just so we're clear, is that once Saint Francis has the data,

8    if we chose to object to the production of the de-anonymized

9    information, that's an issue that we could raise before Judge

10   Nagala, and she would decide it in the case-in-chief.  I don't

11   know whether we would do that or not in light of this hearing,

12   but Mr. Bina's suggestion is we would have that option at that

13   point.

14         THE COURT:  Of course.  So the only issue before me

15   is whether Press Ganey should be compelled to produce the

16   information that Hartford is seeking.  So, you know, and Press

17   Ganey is now basically saying, you know, Press Ganey

18   understands my ruling on this particular issue, but it wishes

19   for an extra layer of protection by having Saint Francis go

20   through and identify the relevant survey responses.  And if it

21   turns out, Mr. Ettinger, based on your review, the survey

22   responses, for whatever reason, is either not relevant, not

23   responsive, or some other legal argument to be made, I'm not

24   going to stand in the way of Saint Francis raising issues with

25   the presiding District Judge.

1          Mr. Caseria?

2          MR. CASERIA:  Yeah, your Honor.  I do not appreciate

3   that -- that that was part of Mr. Bina's request.  The way I

4   had understood it, Mr. Bina -- right now Press Ganey is

5   sitting on 400 physician survey responses that include Saint

6   Francis doctors but include doctors that are not Saint Francis

7   doctors, right?  So the challenge is Press Ganey has to

8   produce this to us, and the challenge is to identify the Saint

9   Francis doctors.  That is something that we can do.  That is

10  something that Ettinger can do.  It's a matter of simply

11  matching up names to Saint Francis and saying, okay, these

12  doctors are not -- not these other ones over here.

13          I think what -- if what's being proposed is

14  Mr. Ettinger can now go through the entire set and object to

15  the production of anything in an entirely separate proceeding

16  before a different judge, he's essentially eviscerated and

17  undone this entire motion practice and this entire hearing

18  that we're having now, right?  Essentially he's saying, let's

19  go back to square one, and Mr. Ettinger will re-raise all the

20  issues that he has in a different forum with a different

21  judge.

22          THE COURT:  Well, I don't -- because there is a

23  ruling on the confidentiality privacy issue.  I am overriding

24  that concern because the information is relevant, at least the

25  way Hartford has described the information.  And I think,

1   then, Mr. Caseria, you're jumping the gun and assuming that

2   Mr. Ettinger is going to oppose the production of the specific

3   survey responses that are relevant to the 2016 and 2018

4   surveys.  And if, in fact, objections are raised, I don't know

5   what those objections are going to be, but certainly if it's

6   going to the same objections as objections raised by

7   Mr. Ettinger today, I believe that the law of the case should

8   apply in that scenario.  So I don't know what Mr. Ettinger is

9   going to do, and I don't know what the presiding District

10  Judge is going to do.  But what I do know is that Mr. Bina is

11  proposing an alternative that is -- that better balances the

12  interests of Hartford and these physicians who submitted their

13  responses.  So that's the way we're going to handle

14  Category 1.

15          You know, I have a 9:30 -- I'm sorry, 10:00 o'clock

16  status hearing.  I don't think that it's going to take too

17  long.  So if I --

18    (Discussion had about another case.)

19          THE COURT:  Let me come back to the Saint Francis

20  case.  Mr. Caseria, do you want to give me an update on

21  Category 2 documents?

22          MR. CASERIA:  Sure.  So we talked about the raw

23  input.  I'll move now to final survey responses in terms of

24  what was provided to -- from Press Ganey to Saint Francis at

25  the end of the survey work that was done.  And our

1　understanding is this falls into two categories.  One is,

2　there's a PowerPoint deck of some sort that Press Ganey puts

3　together that summarizes responses to multiple choice, so

4　yes-no questions, right?  75 percent doctors answered yes to

5　this, 25 percent answered no to that.  There's some

6　observation, there's a few other things that may be in those

7　decks, but it's essentially a single deck for 2016 and another

8　one for 2018.

9　　　　　When we met-and-conferred yesterday, Press Ganey

10　indicated that they had located decks for 2016 and 2018.  And

11　what we discussed is that they would provide those to

12　Mr. Ettinger, Mr. Ettinger would take a look at those, and

13　assuming no objection would provide those to us.  So I think

14　we have a resolution on that part of the final package.

15　　　　　The other part of the final package is the raw

16　written comments, which is essentially -- which is provided

17　to -- from Press Ganey to Saint Francis through a portal, an

18　online portal.  As I understand it, it's essentially the same

19　information that we just talked about.  The only difference is

20　it's anonymized, right?  So to the extent that we are going to

21　end up receiving responses for Saint Francis doctors that are

22　de-anonymized, I don't think we're going to need to also

23　receive the same thing in anonymized form, so --

24　　　　　THE COURT:  All right.  Let me -- I'm sorry, let me

25　just pause because I think Mr. Victor just joined the call.

1        Is that right?  Mr. Michael Victor?

2        MR. VICTOR:  That's true, your Honor.  I just entered

3   the call.

4        THE COURT:  All right.  Yes.  So parties in 23 CV

5   15002, please stand by, I will come right back to you.

6     (Case passed.)

7        THE CLERK:  Case 23 CV 15002, Saint Francis Hospital

8   and Medical Center, Inc., versus Hartford Healthcare

9   Corporation, *et al*, here on motion hearing.

10       THE COURT:  Okay.  We still have Mr. David Ettinger?

11       MR. ETTINGER:  Yes, your Honor.

12       THE COURT:  Mr. Caseria?

13       MR. CASERIA:  Yes, your Honor.

14       THE COURT:  And Mr. Bina?

15       MR. BINA:  Yes, your Honor.

16       THE COURT:  You know, I want to follow up on

17   something that you just said, Mr. Caseria.  You said something

18   to the effect that the anonymized and written comments were

19   available to Saint Francis through an online portal.  Is that

20   right?

21       MR. CASERIA:  That's my understanding, yes.

22       THE COURT:  So Mr. Bina, do you know anything about

23   this?

24       MR. BINA:  Um, I believe what he is referring to,

25   your Honor, is around the time when the survey was conducted,

1    and likely thereafter, this is the online tool I was referring

2    to earlier where, yeah, there is a private log-in, right, for

3    our client to review the data and see the outcome and perhaps

4    slice and dice the numbers, if they'd like.  And I believe

5    just over the passage of time that was taken down, right,

6    because --

7          THE COURT:  I see.

8          MR. BINA:  -- I suppose it became moot.  And

9    unfortunately the platform server that we used, that provider

10   we no longer worked with; and, therefore -- of course we

11   wanted to protect the underlying data in case Saint Francis

12   ever needed it again, so we archived that.  It's just we don't

13   have, let's say, the beautiful overlay on the web for them to

14   access.

15         THE COURT:  Okay.  I was curious because if we have

16   access through that portal, Category 1 can be streamlined.

17   But doesn't sound like that's possible.

18         MR. BINA:  Unfortunately not.  I agree that would

19   have been a lot easier.  But that's not what we're dealing

20   with.

21         THE COURT:  Okay.  Thank you.  Thank you.

22         Mr. Caseria, I don't know whether you were done with

23   your update.  I cut you off.  Go ahead and please finish.

24         MR. CASERIA:  Sure.  Sure.  Thank you, your Honor.

25   Yeah, so I did cover the two categories of what we understand

1  from the meet-and-confer process to be that what would be

2  included in the final package.  And I think on the PowerPoint

3  decks, if I understand from our meet-and-confer with Press

4  Ganey yesterday, they're willing to provide those, they

5  already have them.  It's, you know, again, they want to send

6  that to Saint Francis for them to take a look first.  And so

7  that -- as I understand it is, that's all happening.

8           And then with respect to the anonymized comments, to

9  the extent we end up receiving the de-anonymized information

10  we talked about in Category 1, my understanding is this would

11  be duplicative, and we don't really need it.  So I would table

12  this category, with respect to the written comments, I would

13  table it pending what we get on Category 1, if that makes

14  sense.

15           THE COURT:  Yes, but can you be more clear as to

16  exactly what Press Ganey is willing to give to Mr. Ettinger's

17  office?

18           MR. CASERIA:  Sure, yeah.  As I understand -- and

19  Mr. Bina can correct me if I'm wrong, but as I understand from

20  yesterday's meet-and-confer, they located two PowerPoint

21  decks, one for 2016 and one for 2018, which lay out sort of

22  executive-summary-type information about percentages of

23  doctors that responded a certain way or a different way to

24  various questions, and also includes some observations about

25  the data and the responses.  It's two -- two documents.

1    THE COURT:  Thank you.  How are these PowerPoint

2    decks different from the survey report, well, the 2018 survey

3    report that you received in discovery, Mr. Caseria, as far as

4    you know?

5    MR. CASERIA:  So the -- right.  As far as I know, the

6    written comments -- the written survey responses that we have

7    would have been -- would have fallen into the other category.

8    Would have been something that someone generated through the

9    portal running some kind of a report, as best as we can tell.

10   Someone having to go down that road to generate the document

11   that we have.  So that's separate and apart from the two

12   PowerPoint decks that I have described, which we talked about

13   on our meet-and-confer yesterday.

14   THE COURT:  Okay.  Any comments from you on the

15   second category of documents, Mr. Ettinger?

16   MR. ETTINGER:  No, your Honor.

17   THE COURT:  Mr. Bina?

18   MR. BINA:  No, your Honor.  I think that accurately

19   summarizes it.  The PowerPoints are effectively the, you know,

20   work product, right, that we would have given our clients

21   saying, hey, here's how you're reporting, here's what the

22   numbers look like, and so on.  Again, it is what it is, right?

23   It is -- it does not contain the physician's name, it's really

24   that high-level summary data.  But, again, we have it, and

25   like I said, we're -- we certainly would be willing to share

1     that with Mr. Ettinger as I know what we talked about

2     yesterday.

3            THE COURT:  Okay.  Thank you.  Mr. Caseria, let's

4     move on to Category 3.

5            MR. CASERIA:  Sure.  So the last category is the

6     documents relating to the specific process of getting from the

7     raw input to the final package.  And based on the

8     meet-and-confer discussions we've had, our understanding from

9     Press Ganey, that's largely an automated process.  The survey

10    respondents enter their responses, and it's -- turning that

11    into the final package is automated.  And so our understanding

12    is there is not going to be a whole lot there.  And based on

13    that representation, and also based on what your Honor

14    observed at the last hearing, which is that nobody in this

15    three-way discussion is making the argument that the materials

16    that we're talking about are unreliable, our position is we'll

17    table this category.  And if either of those two things

18    change, we may need to come back to it.  But for now we're

19    good deferring and tabling this issue.

20           THE COURT:  Thank you.  Mr. Ettinger, any comments?

21           MR. ETTINGER:  No, your Honor.

22           THE COURT:  Mr. Bina, any comments?

23           MR. BINA:  Your Honor, just a very brief one.  Mr. --

24    I agree with what Mr. Caseria said.  He said, though, it is

25    largely automated.  I would just clarify that to say it is

1    automated.  I don't believe there is any interaction, these

2    are, you know, Numbers 1 through 5, and the computer just

3    calculates that.  So there is no kind of magic happening

4    behind the curtain that we could even respond to.  But I think

5    that's -- we reached the right result on this one, which is to

6    say I think we can just move on.

7         THE COURT:  Thank you.  So let me then turn to you,

8    Mr. Bina, how quickly can you provide the two categories of

9    documents we've been talking about this morning to

10   Mr. Ettinger's office?

11        MR. BINA:  Your Honor, an excellent question.  I

12   don't have a specific number, and I recognize we are on the

13   cusp of a couple federal holidays next week.  But I would

14   respectfully request a reasonable period of time to get with

15   my client and let them know what the Court's view is here.  I

16   think -- it shouldn't be too bad because, of course, I assume

17   this is all digital.  But I would ask at minimum if I could

18   have 14 days in which to follow-up.

19        THE COURT:  What I will do is this:  I'll set a

20   deadline of January 12th for production.  When we talk about

21   production, I'm talking about Category 1, the raw survey

22   responses, de-anonymized.  And that information is to be

23   marked as attorneys' eyes only.

24        Then you have the second category of documents.

25   These are the PowerPoint decks for 2016 and 2018.  And I will

1  leave it to Press Ganey about how to go ahead designate those

2  test decks.  And both categories of documents to be produced

3  to Mr. Ettinger by January 12th.

4          And in terms of Saint Francis producing the documents

5  to Hartford, January 12th, I'm going to set it for

6  January 26th and allow Mr. Ettinger to seek any relief in

7  terms of extension required with the presiding District Judge.

8  Is it before a District Judge or a magistrate judge in terms

9  of discovery supervision?

10          MR. ETTINGER:  A District -- well --

11          THE COURT:  Okay.

12          MR. ETTINGER:  It depends on the issue, your Honor.

13  In some cases, the District Judge has referred particular

14  issues to the magistrate judge.  And in terms of party

15  discovery to date, she handles all the party discovery.

16          THE COURT:  Got it.  So that's the way we are going

17  to handle this.  Any questions from you, Mr. Caseria?

18          MR. CASERIA:  No, your Honor.  I think that's clear.

19  Thank you.

20          THE COURT:  Mr. Ettinger?

21          MR. ETTINGER:  No, your Honor.  Are you just to be --

22  well, I guess I do have one.  So on that January 26th date,

23  assuming we wanted to object, I don't know that we would, is

24  that the deadline by which we would need to object, or is this

25  going to be an order that requires us to produce by that date

1    so we would need relief from the District Court by that date?

2         THE COURT:  I'll -- well, either -- either objections

3    to be raised or produced.

4         MR. ETTINGER:  Thank you.

5         THE COURT:  Okay?  So that you're clear.

6         Mr. Bina, anything from you?

7         MR. BINA:  Maybe just a procedural question, your

8    Honor.

9         THE COURT:  Yes.

10        MR. BINA:  I understand we're up on a motion and your

11   Honor is making a ruling.  Is it fair to say that this would

12   be kind of granted in part, denied in part?  I'm just

13   wondering how to characterize that.  Or else we'll just wait

14   for the ruling.  But I just was curious for my notes how I

15   should note that.

16        THE COURT:  Yes, that's perfectly fine.  Granted in

17   part, denied in part as moot, given the agreement reached

18   between Press Ganey and Hartford with respect to some of the

19   other things that were requested in the -- I'm sorry, in the

20   subpoena.

21        MR. BINA:  Very good.  Thank you, your Honor.

22   Obviously we --

23        THE COURT:  But I --

24        MR. BINA:  -- Press Ganey just wants to make sure we

25   have closure and we've discharged our obligations under the

1    subpoena.  So I appreciate that.

2             THE COURT:  Got it.  Yes, I will be issuing a

3    follow-up order sort of summarizing what we discussed today.

4             MR. CASERIA:  Your Honor, on that last point it

5    sounds like you're planning to do that, but we -- to the

6    extent you're planning to issue an order memorializing what we

7    talked about, confidentiality, et cetera, again, to your point

8    that may be dealing with objections in front of a different

9    judge, it would be helpful to know what's -- what your rulings

10   are here today on the issues that we discussed.  So I will

11   just flag that.  But no other comments.  Thank you, your

12   Honor.

13            THE COURT:  Okay.  I mean, obviously a transcript is

14   available if you need to access one, so.  Thank you.  Happy

15   holidays.

16            MR. CASERIA:  Understood.

17            MR. ETTINGER:  Thank you, your Honor.

18            MR. CASERIA:  Thank you, your Honor.

19            MR. BINA:  Happy holidays.

20            THE CLERK:  This hearing is adjourned.

21       (Which were all the proceedings heard.)

22

23

24

25

```
 1                        CERTIFICATE

 2     I certify that the foregoing is a correct transcript from

 3  the digital recording of proceedings in the above-entitled

 4  matter to the best of my ability, given the limitations of

 5  using a digital-recording system.

 6

 7  /s/Sandra M. Tennis              January 4, 2024

 8  _____     _____
    Sandra M. Tennis                 Date
 9  Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```